IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-01340-PAB-MJW

TIMOTHY DOTY,

     Plaintiff,

v.

CITY AND COUNTY OF BROOMFIELD,
SGT. MIKE JONES, and
STACEY JASPER,

     Defendants.

---

**ORDER**

---

This matter is before the Court on Defendants' Combined Motion and Memorandum Brief in Support of Motion for Summary Judgment [Docket No. 60] filed by defendants the City and County of Broomfield ("Broomfield"), Sergeant Mike Jones, and Officer Stacey Jasper and on the Objection to Magistrate Judge's Order Denying Plaintiff's Motion for Leave to Amend the Complaint [Docket No. 75] filed by plaintiff Timothy Doty. This case concerns injuries that plaintiff suffered when he fell from the top bunk while incarcerated at the Broomfield Detention Center ("BDC") in Broomfield, Colorado. The Court's jurisdiction is based on 28 U.S.C. § 1331.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted. At all relevant times, Mr. Doty has been a resident of Colorado. Docket No. 1 at 2-3, ¶ 6. The BDC is a facility that houses both pre-trial detainees and persons serving sentences. It is run by

the City and County of Broomfield, Colorado ("Broomfield").  In May 2010, Sergeant

Jones was a mid-line shift supervisor who oversaw day-to-day BDC operations in

cooperation with four other sergeants and under the direction of the BDC's commander.

Docket No. 68 at 5, ¶ 39; Docket No. 72 3, ¶ 39; Docket No. 68-6 at 3 (Jones dep., at 7,

l.4 to 8, l.25).  In May 2010, Stacey Jasper was an officer in the Broomfield Police

Department's Detention Division.  Docket No. 60-3 at 1.  Broomfield is a county and

municipal corporation organized under the laws of the State of Colorado.  Docket No. 1

at 3, ¶ 7; Docket No. 14 at 1, ¶ 1.

On November 28, 2009, Mr. Doty was arrested in Broomfield for unlawful

possession of a controlled substance, driving with a revoked license, and driving with an

obstructed view.  Docket No. 60 at 4, ¶ 1; Docket No. 68 at 3.  Mr. Doty was booked

into the BDC.  Docket No. 60 at 4, ¶ 2; Docket No. 68 at 3.  During his intake, Mr. Doty

completed a Health Care Intake Sheet, on which he checked "Yes" to indicate he had a

history of seizures and stated he had experienced "4 or 5 in last year."  Docket No. 60-4

at 1.  Nurse Barbara Wisniewska conducted a medical review for Mr. Doty during which

she reviewed his Intake Sheet.  Docket No. 60 at 6, ¶ 13; Docket No. 68 at 3; Docket

No. 68-10 at 3 (Broomfield Rule 30(b)(6) dep., at 14, ll.1-9).  BDC has delegated

responsibility for medical reviews to nurses, such as Nurse Wisniewska.  Docket No.

68-10 at 3 (Broomfield Rule 30(b)(6) dep., at 15, ll.1-14).  Nurse Wisniewska is the

BDC's health services administrator, who runs the medical unit.  Docket No. 68-10 at 3

(Broomfield Rule 30(b)(6) dep., at 16, ll.11-12).  Mr. Doty told Nurse Wisniewska that

he had experienced a grand-mal seizure in 2006 for which he had been hospitalized.

Docket No. 68 at 5, ¶ 43; Docket No. 68-1 at 7 (Doty dep., at 137, ll.3-16) ("Q.  What do

2

you recall from that 45-minute conversation with the nurse?  A.  I discussed my seizure

disorder. . . . We talked about the 2006 incident"); Docket No. 72 at 4, ¶ 43.  Nurse

Wisniewska noted on Mr. Doty's Intake Sheet that he had a head injury related to a

three-story fall and that he reported a history of seizures.  Docket No. 60-4.  She added

the instruction that he be placed in a "lower tier, lower bunk."  *Id*.  She then made the

following entry in Mr. Doty's Inmate Log: "Inmate Doty has a history of having seizures

(per Inmate).  Please place inmate - lower tier, lower bunk."  Docket No. 60-6 at 1.

From November 28, 2009 through November 30, 2009, Mr. Doty was assigned to the

lower bunk of a cell in the Special Management Unit ("SMU").[1]  Docket No. 60 at 6,

¶ 16; Docket No. 68 at 3.

On May 10, 2010, Mr. Doty was booked into the BDC again.  Docket No. 60 at 6,

¶ 17; Docket No. 68 at 3.  He informed the intake nurse of his history of seizures and

was assigned to a lower bunk in a cell in the SMU.  Docket No. 60 at 6, ¶ 17; Docket

No. 68 at 3, 5, ¶ 43; Docket No. 72 at 4, ¶ 43.  On May 13 or May 14, 2010, Sergeant

Jones and several other officers held an inmate classification meeting at which they

determined that Mr. Doty should be classified as part of the general prison population

and moved out of the SMU.  Docket No. 60 at 6, ¶ 19; Docket No. 68 at 3.  During the

classification meeting, Sergeant Jones found Nurse Wisniewska's 2009 notation

concerning Mr. Doty's reports of seizures.  Docket No. 60 at 6, ¶ 20; Docket No. 68 at

3.  Sergeant Jones did not note any medical concerns on Mr. Doty's classification

---

[1]The SMU houses "[i]nmates that cannot get along with others, who are on
disciplinary lockdown, or who must be kept separate from others through no fault of
their own."  http://www.broomfield.org/index.aspx?NID=854.

forms.  Docket No. 60 at 7, ¶ 23; Docket No. 60-8 at 1; Docket No. 68 at 3-4, ¶ 23.  In

an affidavit, Sergeant Jones states that he placed "a yellow sticky note on the top of

Doty's file . . . alerting the day shift to review [Mr. Doty's] medical logs before making his

final cell and bunk assignments."  Docket No. 60-7 at 3, ¶ 7.  The sergeant who worked

the following day shift testified that he could not remember whether or not he saw the

sticky note Sergeant Jones describes.  Docket No. 68-8 at 5 (LaFleur dep., at 57, l.14

to 58, l.6).

Officer Jasper was on duty in the Men's Pod on May 14, 2010, when Mr. Doty

was transferred there from the SMU.  Docket No. 60 at 7, ¶ 25; Docket No. 68 at 3.

Officer Jasper directed Mr. Doty to a cell in which another inmate, Ismun Tucker, was

occupying the bottom bunk.  Docket No. 60 at 7, ¶ 27; Docket No. 68 at 4, ¶ 27.  Officer

Jasper told Mr. Doty that only the top bunk was available.  Docket No. 60 at 4 n.4;

Docket No. 68 at 6, ¶ 54; Docket No. 72 at 3.[2]  Mr. Doty told Officer Jasper that he

needed a bottom bunk.  *Id*.  Mr. Doty asserts, and defendants deny, that he told Officer

Jasper that he needed a bottom bunk because of his history of seizures.  *See* Docket

No. 60-5 at 7 (Doty dep. at 193, l.2 to 196, l.22); Docket No. 68-9 at 3, ¶ 8.  Officer

Jasper then made an entry in the BDC's Offendertrak program indicating that Mr. Doty

had been assigned to a lower bunk.  Docket No. 60 at 7, ¶ 28; Docket No. 68 at 3.

From May 14, 2010 through May 29, 2010, Mr. Doty slept on the top bunk.

Docket No. 68 at 6, ¶ 56; Docket No. 72 at 3 n.3.  At some point before May 29, 2010,

---

[2]For purposes of their motion for summary judgment, defendants do not dispute
Mr. Doty's assertion that Officer Jasper directed him to sleep on the top bunk.  Docket
No. 60 at 4 n.4.  However, should the case go to trial, defendants state that they will
show that Officer Jasper did not direct Mr. Doty to the top bunk.  *Id*.

Officer Jasper reviewed Mr. Doty's Inmate Log, Docket No. 68 at 4, ¶ 33; Docket No. 72 at 3, ¶ 33; Docket No. 68-7 at 11 (Jasper dep., at 119, ll.22-24), and attended a roll call briefing[3] in which Mr. Doty's self-reported history of seizures was discussed. Docket No. 68-7 at 4-5 (Jasper dep., 40, l.19 to 43, l.1).

On the evening of May 14, 2010, Sergeant Jones reviewed the muster and the Drill Down Detail Report to ensure that Mr. Doty had been assigned to the correct bunk. Docket No. 60 at 8, ¶ 29; Docket No. 60-11; Docket No. 68 at 4, ¶ 29. Sergeant Jones did not go into Mr. Doty's cell to verify which bunk he was sleeping in. *Id*. Sergeant Jones had been trained to verify bunk assignments by checking the records; it is the job of the officers to physically check that prisoners are in the correct bunks by performing regular walk-throughs, bunk checks, and head counts. Docket No. 60 at 9, ¶ 41; Docket No. 68 at 3, 4, ¶ 29; Docket No. 68-6 at 5 (Jones dep., at 19, ll.1-19). Officer Jasper conducted regular head counts in the Men's Pod on May 14 and May 22, 2010. Docket No. 68 at 6-7, ¶ 56; Docket No. 72 at 5, ¶ 56(#2).

On May 20, 2010, Nurse Wisniewska conducted a routine health assessment for Mr. Doty. Docket No. 60 at 8, ¶ 36; Docket No. 68 at 3. Under "Current complaints," she noted "[history] of seizures - no meds." Docket No. 60-9 at 1. She also wrote "Inmate claims that he has [history] of seizures, but he is not on any medications for it, and also he doesn't have Dr. who diagnosed him w/ seizures." *Id*.

Sometime around midnight on May 29, 2010, Mr. Doty had a seizure, which

---

[3]Roll call briefings provide an opportunity for officers who worked the previous shift to pass on information to the next shift, particularly information related to inmates who require special medical care or attention. Docket No. 60 at 8, ¶ 32; Docket No. 68 at 3.

caused him to fall from the top bunk, hitting his head on a desk and then the floor.
Docket No. 68 at 7, ¶ 57; Docket No. 68-15; Docket No. 72 at 3.  Mr. Doty has suffered
a number of injuries as a result of this fall.  *Id*; Docket No. 68-9 at 4, ¶ 14 ("Since the
incident, my brain functioning has not been the same.  I experienced increased memory
loss, I have been unable to focus like I did before the incident, tasks that once took me
30 minutes now take me about 4 hours.  I feel emotionally flat.  I have lost my business
due to my inability to perform tasks like I used to and have been declared legally
disabled by the Social Security Administration.").

As of December 2012, Mr. Doty was not aware of having received any diagnosis
of a seizure disorder from a physician.  Docket No. 60 at 5, ¶ 10; Docket No. 60-5 at 4-5
(Doty dep., at 132, l.25 to 133, l.4); Docket No. 68 at 3, ¶ 10.  Mr. Doty has never had
his driver's license revoked or been told not to drive for medical reasons.  Docket No.
60 at 5, ¶ 11; Docket No. 68 at 3.

Over the past four to five years, six or seven prisoners at BDC have fallen from a
top bunk.  Docket No. 68 at 5, ¶ 42; Docket No. 68-10 at 14 (Broomfield Rule 30(b)(6)
dep., at 97, l.24 to 99, l.11); Docket No. 72 at 4, ¶ 42.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when
the "movant shows that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if
under the relevant substantive law it is essential to proper disposition of the claim.

6

*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary

judgment.  *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).

An issue is "genuine" if the evidence is such that it might lead a reasonable jury to

return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th

Cir. 1997).

## III.  ANALYSIS

### A.  Individual Defendants

Mr. Doty alleges that Sergeant Jones and Officer Jasper (the "individual

defendants") violated the Eighth Amendment by placing him in a top bunk despite their

awareness that he had reported a history of seizures.  Docket No. 1 at  6-8, ¶¶ 21-34.

The individual defendants contend that they are entitled to qualified immunity on this

claim.  Docket No. 60 at 10-17.

Qualified immunity shields government officials from claims for money damages

absent a showing that (1) the official violated a constitutional right and (2) the right was

"clearly established" at the time the challenged conduct occurred.  *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982).  In contrast to a standard motion for summary

judgment–which places the burden on the moving party to demonstrate the lack of a

genuine issue of material fact–a motion for summary judgment based on a claim of

qualified immunity shifts the burden to the non-moving party.  *Lynch v. Barrett*, 703 F.3d

1153, 1158 (10th Cir. 2013) (citation omitted).

Accordingly, a plaintiff opposing a motion for summary judgment on the basis of

qualified immunity must carry a two-part burden. *Hobbs ex rel. Hobbs v. Zenderman*, 579 F.3d 1171, 1183 (10th Cir. 2009). First, he must show that "a 'favorable view' of the facts alleged show[s] the violation of a constitutional right." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223, 235-36 (2009)). Second, he must show that the right violated was clearly established at the time of the defendant's actions. *Serna v. Colo. Dept. of Corrs.*, 455 F.3d 1146, 1150 (10th Cir. 2006) (citing *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

### 1. Eighth Amendment Violation

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("The Eighth Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.'") (citing *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 199 (1989)). "The analysis [of an Eighth Amendment claim] should not be based on 'a court's idea of how best to operate a detention facility,'" but should reflect "the evolving standards of decency that mark the progress of a maturing society," which the Tenth Circuit has characterized as a "lofty standard." *DeSpain v. Uphoff*, 264 F.3d 965, 973-74 (10th Cir. 2001) (citing *Rhodes v. Chapman*, 452 U.S. 337, 351 (1981)).

To prevail on his claim that defendants violated the Eighth Amendment, Mr. Doty must show that (1) objectively, the harm he complains of is sufficiently "serious" to merit

constitutional protection and (2) defendants Jones and Jasper were subjectively aware of a substantial risk to Mr. Doty's health or safety and acted in purposeful disregard of that risk. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

### a. Objectively Serious

In evaluating an Eighth Amendment claim for deliberate indifference to a serious risk of substantial harm, the Tenth Circuit "first look[s] to whether the harm suffered rises to a level 'sufficiently serious' to be cognizable" under the Constitution. *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir. 2005) (criticizing as "limited" the language in *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001), that a "sufficiently serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."). In this formulation, it is the "alleged harm" that must be sufficiently serious and not the "symptoms displayed to the prison employee." *Id.* at 753 (citing *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (evaluating a prisoner's symptoms to determine whether they constituted, in themselves, serious harm under the Eighth Amendment); *see also Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) ("In *Mata*, we explained that it is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely 'the symptoms presented at the time the prison employee has contact with the prisoner.'"). The "symptoms displayed are relevant only to the subjective component of the test: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Mata*, 427 F.3d at 753. Where "the deprivation

9

alleged is a failure to prevent future harm to a healthy individual, the inmate must prove that his future health was unreasonably jeopardized by a risk to which contemporary society would not expose any unwilling individual." *Bowers v. Milwaukee County Jail Medical Staff*, 52 F. App'x 295, 298 (7th Cir. 2002).

In this case, the harm that Mr. Doty complains of is falling from the top bunk and injuring his head.  Docket No. 1 at 2, ¶ 1 ("On or about May 29, 2010, the inevitable occurred and Mr. Doty had a seizure while sleeping on the top bunk of his cell.  He fell several feet, smashing his head on a table, lacerating his forehead, and badly damaging his brain, which has caused Mr. Doty several ongoing disabilities to this day."); *see also* Docket No. 68-16 at 3 (Emergency Room records documenting an eight-centimeter laceration on Mr. Doty's face and scalp); Docket No. 68-13 at 6 (Tucker dep., at 43:2 to 44:20) ("he snapped it right on the corner of the desk;" "it looked like his head was the first thing to come off the bunk, followed by his feet"). Defendants do not dispute that Mr. Doty fell from his bunk nor do they dispute the nature of his resulting injury.  Head trauma of this nature is sufficiently serious to meet the constitutional standard.  *See, e.g.*, *Rider v. Werholtz*, 548 F. Supp. 2d 1188, 1195 (D. Kan. 2008) (bleeding from head trauma sufficiently serious under Eighth Amendment); *Bastian v. Fortunato*, No. 08-cv-00489-REB-MEH, 2008 WL 4717469, at *5 (D. Colo. Oct. 24, 2008) (holding that "the head trauma sustained by Plaintiff causing loss of memory, equilibrium problems, and continued loss of hearing" met the objective prong of an Eighth Amendment violation).

### b.  Deliberate Indifference

The Eighth Amendment does not reach a prison official's conduct unless the

official "knows of and disregards an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at

837; *see also Verdecia v. Adams*, 327 F.3d 1171, 1175-76 (10th Cir. 2003) ("Deliberate

indifference requires that the defendant's conduct is in disregard of a known or obvious

risk that was so great as to make it highly probable that harm would follow, or that the

conduct disregards a known or obvious risk that is very likely to result in the violation of

a prisoner's constitutional rights.") (internal citations omitted).  An action

unaccompanied by a subjective awareness of an unreasonable risk of harm does not

constitute "punishment" within the meaning of the Eighth Amendment.  *Farmer*, 511

U.S. at 837-38.  A court "may infer the existence of this subjective state of mind from

the fact that the risk of harm is obvious."  *Hope v. Pelzer*, 536 U.S. 730, 738 (2002); *see*

*also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("In order to state a cognizable claim, a

prisoner must allege acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs.").  A prison official must be subjectively aware of

the specific harm claimed by the prisoner and not simply aware that harm, in a general

sense, could occur.  *Martinez*, 563 F.3d at 1089.

In *Martinez v. Rittenhouse*, No. 07-cv-02087-WYD-KLM, 2008 WL 2952361 (D.

Colo. July 29, 2008), the court held that a prisoner's Eighth Amendment claim against a

nurse practitioner for refusing to reassign him to a bottom bunk did not satisfy the

11

objective prong of an Eighth Amendment analysis because the plaintiff had not been diagnosed with arthritis of the knee (his stated reason for needing a bottom bunk) and because the defendant nurse had concluded that plaintiff's regular activities and his physical presentation did not merit further medical attention or reassignment to a bottom bunk.  The court concluded that the nurse's assessment "shows [plaintiff's] injury was not so apparent that a lay person would have been able to observe that he was in need of medical attention."  *Id*. at *2.

The Court will now consider how these principles apply to plaintiff's claims against Sergeant Jones and Officer Jasper.

### i.  Sergeant Jones

Mr. Doty argues that Sergeant Jones is liable under the Eighth Amendment because he was aware of the notes that Nurse Wisniewska had made in the Inmate Log regarding Mr. Doty's reported history of seizures, but did not document that condition in the classification documents or communicate the restriction directly to any of the officers who might be in the position of assigning Mr. Doty to a bunk.  Docket No. 68 at 13.  Defendants counter that Sergeant Jones was not on notice that Mr. Doty had been diagnosed by a physician as having a seizure disorder, that he was only responsible for communicating the bunk assignment to the sergeant in charge of the day shift, and that he properly reviewed the assignments on the computer system to verify that Mr. Doty had been assigned to the correct bunk.  Docket No. 72 at 6-7.

It is undisputed that Sergeant Jones reviewed the Drill Down Detail Report at the beginning of his shift on May 14, 2010, and that the Report indicated that Mr. Doty had been assigned to a bottom bunk, in accordance with Nurse Wisniewska's notes.

Docket No. 60 at 8, ¶ 29; Docket No. 60-11 ("BDC, MEN'S, M-11 FLEX/MEDICAL, M-11 L-BUNK"); Docket No. 68 at 4, ¶ 29.  There is no evidence that, prior to May 29, 2010, Sergeant Jones saw Mr. Doty in a top bunk, was told by anyone that Mr. Doty was occupying a top bunk, or came across documentation indicating that Mr. Doty was occupying a top bunk.  Thus, there is no basis on which a jury could find that Sergeant Jones was subjectively aware of a serious risk that Mr. Doty would suffer the harm claimed in this case–namely, that he would fall from a top bunk during a seizure.  *See Martinez*, 563 F.3d at 1089.  Mr. Doty's argument that Sergeant Jones acted with deliberate indifference because he did not document Mr. Doty's bunk restriction more clearly or communicate it directly to a detention officer–despite the fact that several other BDC inmates had fallen from their bunks in the past–implicates, at the most, negligence and does not rise to the level of an Eighth Amendment claim.  *See DeSpain*, 264 F.3d at 973.

### ii.  Officer Jasper

Mr. Doty argues that Officer Jasper is liable under the Eighth Amendment because she was aware of Nurse Wisniewska's notes regarding Mr. Doty's reported history of seizures, but nonetheless assigned him to a top bunk and did not change the assignment despite being confronted with the discrepancy repeatedly over a period of two weeks.  Docket No. 68 at 14-15.  Defendants counter that Officer Jasper did not receive information that Mr. Doty had been diagnosed with a seizure disorder or prescribed medication for a seizure disorder; did not receive information regarding the frequency of his seizures; and did not know that the reason he requested reassignment

to a different bunk was because of his history of seizures.  Docket No. 60 at 15-16.

It is undisputed that, at some point between May 14, 2010 and May 29, 2010, Officer Jasper read Nurse Wisniewska's entry in Mr. Doty's Inmate Log, Docket No. 68-5 at 2 ("Inmate Doty has a history of having seizures (per Inmate).  Please place inmate - lower tier, lower bunk"), and that Officer Jasper heard a sergeant at a roll call briefing state that Mr. Doty suffered from seizures.  Docket No. 68-7 at 4-5 (Jasper dep., at 38, l.19 to 41, l.16); *id*. at 11 (Jasper dep., at 119, l.22 to 120, l.7).  For the purpose of this motion, it is undisputed that Officer Jasper assigned Mr. Doty to a top bunk and conducted four bunk checks on May 14, 2010 and again on May 22, 2010, during at least some of which she would have seen that Mr. Doty was occupying the top bunk.  Docket No. 68-7 at 10 (Jasper dep., at 93, l.2 to 94, l.15).  In addition, there is evidence that Mr. Doty objected to his bunk assignment and told Officer Jasper that he required a bottom bunk because of his history of seizures.[4]  Docket No. 68-9 at 3, ¶¶ 7-8.

This case is distinguishable from *Rittenhouse*, in which the nurse examined the plaintiff and found that his medical complaints were unfounded.  *See* 2008 WL 2952361, at *1 ("Upon observing Martinez's ability to walk with ease, and based on his statements about his physical abilities, Rittenhouse denied his request for a bottom bunk.").  The fact that a physician had not diagnosed plaintiff with a seizure disorder is not dispositive given that plaintiff has submitted evidence that a BDC medical provider

---

[4]Although defendants claim that plaintiff filed an affidavit contradicting his deposition testimony, *see* Docket No. 72 at 2 n.2, there is, in fact, no contradiction: at his deposition, plaintiff was not asked to detail the contents of the conversation that he attests to having had with Officer Jasper after she assigned him to a bunk.  *Compare* Docket No. 68-9 at 3, ¶ 8, *with* Docket No. 72-1 at 2 (Doty dep., at 333, l.3 to 335, l.9).

had assessed his self-reported history of seizures and indicated his placement in a lower bunk.  Docket No. 68-5 at 2.  BDC delegated this duty to Nurse Wisniewska, who was in charge of the medical unit.  Docket No. 68-10 at 3.  There is no evidence that Officer Jasper, who was aware of Nurse Wisniewska's placement note, had information that would have justified her ignoring that note.  Viewing the evidence in the light most favorable to Mr. Doty, it is reasonable to infer that Officer Jasper deliberately disregarded the risk documented by Nurse Wisniewska, and repeated at the time of assignment by Mr. Doty, when she assigned him to a top bunk and subsequently declined to reassign him.

Mr. Doty has successfully shown, at this procedural stage, a violation of the Eighth Amendment on the part of Officer Jasper.

### 2.  *Clearly Established Right*

A constitutional right is clearly established for the purpose of qualified immunity if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") (internal citation omitted).  In other words, the "salient" question is whether "the state of the law" at the time of the defendant's challenged actions afforded "fair warning" that those actions were unconstitutional.  *Hope*, 536 U.S. at 741.

"Ordinarily, [the Tenth Circuit requires] that for a rule to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly

established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (internal citation omitted).  However, it is not necessary that prior cases evidence an identical set of facts. *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). *Hope* "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Id*.  The Tenth Circuit accordingly treats cases as lying along a spectrum: the more "obviously egregious" the conduct, "the less specificity is required from prior case law." *Id*.  This approach requires government officials to make "reasonable applications of the prevailing law to their own circumstances." *Id*.

Mr. Doty argues that defendants violated his rights under the Eighth Amendment by failing to take reasonable steps to abate a substantial risk of serious harm.  Docket No. 68 at 19 (citing *Farmer*, 511 U.S. at 847 n.9).  He further argues that "[m]ultiple circuits have held that *Farmer*'s analytic framework applies to cases involving inmate complaints of a seizure disorder when those inmates are placed on a top bunk." *Id*. Defendants counter that there is no case law that would have put a reasonable official on notice that they might violate the Eighth Amendment by disregarding an inmate's reported medical history, absent any corroborating medical diagnosis or prescription. Docket No. 60 at 17.

In *Estelle*, the Supreme Court held that "intentionally denying or delaying access to medical care or intentionally interfering with [medical] treatment" prescribed by prison

16

doctors constitutes "deliberate indifference to serious medical needs of prisoners." 429 U.S. at 104-05.  In *Helling v. McKinney*, 509 U.S. 25, 33 (1993), the Supreme Court held that prison officials may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year."

Echoing this principle, the Tenth Circuit has held that "a properly pleaded claim of interference by prison officials with prescribed medical treatment is cognizable under § 1983."  *Twyman v. Crisp*, 584 F.2d 352, 354-55 (10th Cir. 1978); *see also Arocho v. Nafziger*, 367 F. App'x 942, 952 (10th Cir. 2010) ("the crux of the claim against [Officer] Lappin is that he knew the serious disease [plaintiff] suffers from and knew that Clinical Director Nafziger recommended treatment . . . and yet refused to approve the treatment."); *Martinez v. Garden*, 430 F.3d 1302, 1305 (10th Cir. 2005) ("Knowledge of [plaintiff inmate's] medical condition, coupled with the alleged failure to inform him of medical appointments or to arrange transportation, may give rise to an inference that defendants acted with deliberate indifference."); *Farrell v. J.E. Hamilton Correctional Ctr.*, 12 F. App'x 788, 790 (10th Cir. 2001) (inmate stated claim for relief under the Eighth Amendment where defendant prison officers assigned him to a top bunk and placed him on heavy outdoor work detail despite note from doctors at a different facility indicating that he should be permanently placed in a bottom bunk because of three pins and arthritis in his hip); *Brown v. Coleman*, 1995 WL 409351, at *2 (10th Cir. July 12, 1995) (inmate stated a claim for relief under the Eighth Amendment where "the prison medical staff repeatedly prescribed surgery to rectify a medical problem and prison officials with no medical training allegedly disregarded this recommendation").

In *Hron v. Jenkins*, 1999 WL 169394, at *2 (10th Cir. Mar. 29, 1999), the Tenth Circuit upheld a grant of summary judgment to defendant prison officials where the plaintiff alleged, in part, that defendants violated the Eighth Amendment by assigning him to an upper bunk despite his claimed seizure disorder.[5]  The court explained:

> Although the government concedes that, at the time of the injury, Mr. Hron should have been assigned to a lower bunk based upon its medical records, [citation], Mr. Hron has failed to come forward with sufficient evidence that Defendants had a subjective knowledge of a substantial risk.  In a sworn declaration in his response to Defendants' motion for summary judgment, he claims that he informed Defendant Accosta that he "was medically assigned to a lower bunk" and informed Defendant Stowers that he "needed to be on a lower bunk due to [his] medical condition." [citation] Without more specific information as to the risk faced by Mr. Hron, Defendants cannot be imputed with subjective knowledge of a substantial risk of serious harm.  The Defendants' evidence indicates no clear diagnosis of epilepsy, at least until after the accident occurred.  [citation]  Although it is unfortunate that Mr. Hron fell and injured his knee, we agree with the district court that Defendants' failure to place him in a lower bunk reflects negligence rather than deliberate indifference.

*Id*. at *2.  The Tenth Circuit's reasoning suggests that, had Mr. Hron specifically explained his reason for wanting a lower bunk to the officers—as Mr. Doty alleges he did—the facts of *Hron* could support a finding of deliberate indifference.

---

[5]Defendants rely on the lower court's statement that plaintiff "acknowledges he received treatment for [his claimed epilepsy], and that he was medically assigned to a lower bunk" to support the proposition that *Hron* is distinguishable from the instant case because prison officials had objective evidence of the plaintiff's condition at the time they assigned him to a top bunk.  *See Hron v. Jenkins*, 15 F. Supp. 2d 1082, 1085 (D. Kan. 1998); Docket No. 72 at 9.  However, the Tenth Circuit characterized the plaintiff's condition as follows: "Mr. Hron suffers from diabetes mellitus and claims that he also suffers from a seizure disorder (which he described as epilepsy in his complaint) that affects him during his sleep."  1999 WL 169394, at *1.  The Tenth Circuit further stated that "[d]efendants' evidence indicates no clear diagnosis of epilepsy, at least until after the accident occurred."  *Id*. at *2.  These statements indicate that the Tenth Circuit did not rely on the existence of objective medical evidence supporting the plaintiff's seizure disorder in issuing its Order.

In *Phillips v. Jasper County Jail*, 437 F.3d 791, 793, 795-97 (8th Cir. 2006), the Eighth Circuit reversed the district court's decision granting summary judgment to defendant prison officials.  The Eighth Circuit found that plaintiff's testimony that he had been assigned to a top bunk–despite the prison officials' knowledge that he had been prescribed anti-seizure medication–was sufficient to raise a genuine dispute of material fact as to whether the officials had acted with deliberate indifference to a substantial risk of serious harm.  *Id.*

Taken together, these cases clearly establish that a prison official who disregards without justification the instructions of a medical professional regarding the care and treatment of an inmate, thereby subjecting the inmate to an excessive risk of serious harm, may be liable under the Eighth Amendment.  Contrary to defendants' contentions, *see* Docket No. 60 at 16-17, existing case law in the spring of 2010 would have put a reasonable officer on notice that disregarding the instructions of the intake nurse delegated the responsibility of performing medical assessments in such a way as to expose an inmate to an excessive risk of substantial harm could violate the Eighth Amendment.  *See, e.g.*, *Twyman*, 584 F.2d at 354-55; *Martinez*, 430 F.3d at 1305.

### 3.  *Punitive Damages*

Mr. Doty seeks leave to amend his complaint to, *inter alia*, add a claim for punitive damages against Officer Jasper.  Docket No. 70 at 1.  Defendants oppose Mr. Doty's motion for leave to amend, but do not address his request for punitive damages.  *See generally* Docket No. 73.

"[A] jury may be permitted to assess punitive damages in an action under § 1983

when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).  This standard is closely related to the standard for liability under the Eighth Amendment as it requires a subjective intent of recklessness.  *See Al-Turki v. Ballard*, No. 10-cv-02404-WJM-CBS, 2013 WL 589174, at *15 (D. Colo. Feb. 14, 2013); *see also Smith*, 461 U.S. at 56 ("this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness").

Since defendants did not object to the addition of this claim, the Court will permit this amendment.  *See* Fed. R. Civ. P. 15(a)(2); Fed. R. Civ. P. 16(b)(4).

### B.  City and County of Broomfield

Mr. Doty's claim against Broomfield is subject to the principles of municipal liability under *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 691 (1978).  To hold Broomfield liable, Mr. Doty must sufficiently allege the existence of an official policy or custom that was the "direct cause" of or the "moving force" behind his injury.  *See Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  "That is, [Mr. Doty] must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Board of County Comm'rs of Bryan Cnty. Okla. v. Brown*, 520 U.S. 397, 404 (1997).  "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must

be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405.

An "official policy or custom" may be shown by evidence of (1) a formal regulation or written policy; (2) an informal custom "amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law"; (3) decisions of employees with final policy-making authority; (4) the ratification by a final decision-maker of a subordinate's actions; or (5) a failure to adequately train or supervise employees. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal citation and alterations omitted).

In his response to defendants' motion for summary judgment, Mr. Doty seeks to establish Broomfield's liability by showing that his bunk assignment was the result of a decision by a final policy-maker or of a widespread practice that has taken hold at the BDC.[6]  Docket No. 68 at 15-19.

### 1. Officer Jasper's Status as a Final Policy-Maker

Mr. Doty argues that Officer Jasper was acting as a final policy-maker on behalf of Broomfield when she assigned Mr. Doty to his bunk because her decision was not

---

[6]These theories differ from the theory asserted in Mr. Doty's complaint, namely, that Sergeant Jones ratified Officer's Jasper's bunk assignment decision.  Docket No. 1 at 8, ¶ 32.  Mr. Doty appears to have abandoned his ratification argument as he does not include it in his response to defendants' motion for summary judgment. *See* Docket No. 68 at 15-19.  On June 14, 2013, four days after submitting his response, Mr. Doty filed a motion to amend his complaint to include the revised claim against Broomfield. Docket No. 70.  Magistrate Judge Michael J. Watanabe denied Mr. Doty's motion to amend on July 10, 2013.  Docket No. 74.  On July 24, 2013, Mr. Doty appealed the magistrate judge's order denying the motion to amend.  Docket No. 75.

constrained by an official policy, was not subject to review by a superior, and was within her grant of authority.  Docket No. 68 at 16-17.  Defendants counter that Officer Jasper is not a final policy-maker with respect to bunk assignments because her decisions are constrained by preexisting policies and are subject to several forms of review.  Docket No. 72 at 10.

Whether a municipal employee has final policy-making authority is a question of state law.  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189 (10th Cir. 2010).  In deciding whether an official is a final policy-maker, the inquiry is focused only on "delegations of *legal power*."  *Id*. (emphasis in original); *see also Wulf v. City of Wichita*, 883 F.2d 842, 869 (10th Cir. 1989) (*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) "directs us to look only at where statutory policymaking authority lies, rather than where *de facto* authority may reside.  Thus, a subordinate who wields considerable *actual* power, yet who lacks the legal power to terminate an employee, may, in the circumstances of this case, be liable, while the City is not.").

The Tenth Circuit has identified three elements to guide the determination of whether a municipal employee is a final policy-maker: (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final–i.e., are such decisions subject to any meaningful review; and (3) whether the policy decisions purportedly made by the official are within the realm of the official's grant of authority.  *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995).  Accordingly, a municipality that entrusts to a particular employee the task of implementing a defined policy is not liable for that employee's unconstitutional

implementation of that policy, while a municipality that entrusts a particular employee with the task of defining municipal policy–without constraining his authority in any way–may be liable.  *Id*. (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483 n.12 (1986) ("[I]f county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability.  This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board.")).

To establish Officer Jasper's status as a final policy-maker, Mr. Doty relies on (1) the Broomfield Rule 30(b)(6) designee's testimony that officers have "some autonomy" to make bunk assignment decisions and that sergeants do not conduct walkthroughs to double-check officers' bunk assignments; and (2) Officer Jasper's testimony that BDC does not have a "set procedure" in place governing the method by which officers inform inmates of their bunk assignment.  Docket No. 68 at 16-17.

However, Mr. Doty does not offer evidence refuting the testimony of the 30(b)(6) witness regarding the general procedures that officers must follow in assigning inmates to bunks:

> They'll get any restrictions from the classification committee regarding any specific information that has to be factored in as far as where the inmates can get housed at in the pod.  Beyond that, our housing directive states that felons will be downstairs and misdemeanors will be upstairs, and then each tier is split in half based on classification of the misdemeanor, high or low, and then the bond, the bond amounts, so the officer has to work within those restrictions of the housing assignments to begin with.

Docket No. 68-10 at 12 (Broomfield Rule 30(b)(6) dep., at 70, ll.4-15).  This undisputed evidence indicates the existence of certain external policies that constrain the bunk

assignment decisions of individual detention officers.  In fact, Mr. Doty's own arguments stress that detention officers are required to follow the determinations of the classification committee, as well as other instructions disseminated through inmate logs and roll-call briefings.  *See, e.g.*, Docket No. 68 at 4, ¶ 33 ("Jasper was required by policy, and in fact did, review the log entries in Doty's inmate log."); Docket No. 68 at 6, ¶ 48 ("Defendant Jasper knew of Doty's seizure disorder and the nurse's instructions that Doty should be placed on the bottom bunk of his cell"); Docket No. 60 at 9, ¶ 41 ("The officers assigned to the Men's Pod are trained to verify that each inmate is in his properly assigned cell and bunk during their pod walk-through, bunk checks, and head counts."); Docket No. 68 at 12 ("The housing classification meeting is designed to review all pertinent materials regarding an inmate, including medical information and bunk restrictions, to determine the proper inmate housing allocation.").

Moreover, sergeants regularly review electronic databases reflecting bunk assignments to ensure that they are correct and compliant with governing policies. Docket No. 60 at 8, ¶ 29; Docket No. 68 at 4, ¶ 29.  The fact that sergeants do not patrol the floor to personally verify whether inmates are in their assigned bunks does not mean that detention officers have unconstrained authority to assign inmates to bunks.  Rather, if a sergeant finds an incorrect assignment in the database, he or she must act to reassign the inmate.  Docket No. 68-6 at 5 (Jones dep., at 19, I.8 to 20, I.21).  In addition to the sergeants' review, bunk checks and walkthroughs are conducted regularly by other officers to ensure that inmates are in their assigned bunks. Docket No. 60 at 9, ¶ 41; 60-7 at 4, ¶ 9; Docket No. 68 at 3; Docket No. 68-7 at 9 (Jasper dep., at 89, I.14 to 92, I.24); Docket No. 68-14.  Officers also have authority to

correct improper bunk assignments.  Docket No. 68-7 at 9 (Jasper dep., at 89, ll.2-4).

Thus, bunk assignments are subject to policy constraints and meaningful review.  *See*

*Randle*, 69 F.3d at 448.

Finally, Mr. Doty mischaracterizes the import of Officer Jasper's testimony

regarding the procedure for assigning inmates to bunks.  Officer Jasper testified that

there is no written procedure for directing inmates to "whatever cell they've been

assigned to."  Docket No. 68-7 at 7 (Jasper dep., at 81, ll.17-24).  This does not,

however, mean that there is no policy for determining which inmate belongs in which

particular bunk–only that there is no set procedure for communicating this assignment

to inmates.

Since Officer Jasper's bunk assignments were limited by the BDC housing

directive, the decisions of the classification committee, and the information

disseminated through roll call briefings, as well as being subject to review by other

detention officers and by sergeants, Officer Jasper was not acting as a final policy-

maker when she assigned Mr. Doty to his bunk.  *See Randle*, 69 F.3d at 448.

### 2. *The BDC's Bunk Assignment Practices*

Mr. Doty argues that Broomfield is liable because, lacking a coherent bunk

assignment policy, it has allowed a custom to take hold by which officers point inmates

to cells without specifying a particular bunk, leaving them to occupy whichever bunk is

physically available at the time.  Docket No. 68 at 17-18.  In support of his argument,

Mr. Doty cites (1) Officer Jasper's deposition testimony that there is no specific

procedure for instructing inmates on their assigned bunk and that officers point to the

assigned cell and tell inmates which bunk to take, Docket No. 68-7 at 7 (Jasper dep., at

25

81, ll.7-24); and (2) Mr. Tucker's deposition testimony that he was "pretty sure" that he was assigned to his cell with "a point of the finger," Docket No. 68-13 at 4 (Tucker dep., at 20, ll.1-23), and that he did not remember hearing inmates being assigned to particular bunks during his four months of incarceration.  Docket No. 68-13 at 7-8 (Tucker dep., at 12, ll.21-23 and 25, ll.1-17).  Mr. Doty claims that this policy was the moving force behind his placement in the top bunk and his subsequent injuries.  Docket No. 68 at 18.  Defendants counter that the initial classification committee meetings, coupled with the regular walkthroughs and bunk checks, constitute "policies the BDC utilizes to prevent" officers from recklessly assigning inmates to bunks.  Docket No. 72 at 10.

The evidence cited by Mr. Doty does not support his contentions.  Officer Jasper did not state that officers assign inmates to cells "without regard or care for bunk assignments," as Mr. Doty asserts.  *See* Docket No. 68 at 18.  Rather, she testified that, when an inmate is brought to the men's pod, "then either the men's pod officer or the SMU officer will direct the inmates to whatever cell they've been assigned to.  And they were told they would be on the upper or bottom bunk or a sled bed."  Docket No. 68-7 at 7 (Jasper dep., at 81, ll.18-22).  Mr. Doty's counsel then confirmed Officer Jasper's answer through the following exchange: "Q.  So you were trained when inmates come over, either you working the men's pod or someone from SMU, tells them which bunk to go to and which cell?  A.  Yes."  Docket No. 68-7 at 7 (Jasper dep., at 82, ll.8-12).

Furthermore, it is undisputed that the BDC officers conduct several walkthroughs, bunk checks, and head counts each day, during which time they verify that each inmate is in the appropriate cell and bunk.  Docket No. 60 at 9, ¶ 41; 60-7 at

26

4, ¶ 9; Docket No. 68 at 3; Docket No. 68-7 at 9 (Jasper dep., at 89, l.14 to 92, l.24);

Docket No. 68-14.  Officers can change bunk assignments based on information

gathered during a walkthrough.  Docket No. 68-7 at 9 (Jasper dep., at 89, ll.2-4).

Drawing all reasonable inferences in Mr. Doty's favor, a fact-finder could

conclude, based on Mr. Tucker's testimony, that BDC officers have a custom of pointing

inmates to their assigned cells and allowing them to take whichever bunk is available,

without verbally directing them to a particular bunk.  However, in light of the BDC's

explicit policy mandating that a rotating team of officers physically verify several times

per day that each inmate is in his assigned bunk, as recorded in the computer system,

it is not reasonable to infer that the BDC's initial bunk assignment practice was the

moving force behind Mr. Doty's injury.  *See Brown*, 520 U.S. at 404.

### 3.  Communication Regarding Bunk Assignments

Mr. Doty argues that the BDC's custom of using ad hoc methods of

communication to pass information from the classification committee to detention

officers is inherently unreliable and caused his injury.  Docket No. 68 at 18-19.

In support of this argument, Mr. Doty relies on (1) Officer Jasper's testimony that

she receives classification information in varying ways from different members of the

classification committee, including telephone calls and emails; (2) Sergeant Jones'

testimony that he placed a sticky note on Mr. Doty's file to inform the day shift

supervisor of Mr. Doty's medical restriction; and (3) the testimony of the day shift

supervisor, Sergeant LaFleur, that he does not remember receiving the sticky note.

Docket No. 68 at 18-19.  Based on this evidence, Mr. Doty asserts that:

Where Defendant Jones described that the only way he communicated that

27

> Doty might have a bunk restriction was using a sticky note addressed to the
> supervising sergeant, and where the supervising sergeant never received the
> information, there is a dispute of fact whether Broomfield's reliance on such
> a system of communication is inherently unreliable and was a moving force
> behind the violation.

Docket No. 68 at 19.

This argument is unavailing for two reasons.  First, the evidence does not support Mr. Doty's contention that "the supervising sergeant never received the information."  During his deposition, Sergeant LaFleur had the following exchange with Mr. Doty's counsel: "Q.  But you didn't receive any sticky note like that?  A.  I can't say whether I did or I did not.  Q.  So you may have received it?  You just don't remember?  A.  Correct."  Docket No. 68-8 at 5 (LaFleur dep., at 58, ll.1-6).  There is no evidence that Sergeant LaFleur "never received" the sticky note.  Second, and more importantly, there is no basis for concluding that this alleged gap in communication was the moving force behind Mr. Doty's injury because Mr. Doty has already established that Officer Jasper was aware of Mr. Doty's reported history of seizures and his bunk restriction at the time she assigned him.  *See, e.g.*, Docket No. 68 at 14.  As discussed above, Mr. Doty's injury was not allegedly caused by a lack of information, but rather by the deliberate disregard of information that was known.

Moreover, Mr. Doty does not explain how Sergeant LaFleur's knowledge of Mr. Doty's medical restriction would have altered the course of events.  On the contrary, Sergeant LaFleur testified that, had he received the sticky note, he "would have given the file . . . to whoever on my team was responsible for classifying" and that he would have relied on that detention officer to assign Mr. Doty to the correct bunk.  Docket No. 68-8 at 3-4 (LaFleur dep., at 36, l.15 to 37, l.6).

28

In sum, Mr. Doty has not raised a genuine dispute of material fact regarding Broomfield's liability for the violation of Mr. Doty's Eighth Amendment rights.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants' Combined Motion and Memorandum Brief in Support of Motion for Summary Judgment [Docket No. 60] filed by defendants the City and County of Broomfield, Sergeant Mike Jones, and Officer Stacey Jasper is GRANTED in part and DENIED in part. It is granted with respect to defendants the City and County of Broomfield and Sergeant Mike Jones. It is denied with respect to Officer Stacey Jasper. It is further

**ORDERED** that the Objection to Magistrate Judge's Order Denying Plaintiff's Motion for Leave to Amend the Complaint [Docket No. 75] filed by plaintiff Timothy Doty is SUSTAINED in part and OVERRULED in part. It is sustained with respect to the request to amend the complaint to add a claim for punitive damages against Officer Jasper. It is otherwise denied. An amended claim against Broomfield as explained by plaintiff in Docket No. 75 would not survive a motion for summary judgment based on the facts established in the briefing as to Docket No. 60 and therefore the proposed amendment to the claim against Broomfield is futile. *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240-41 (10th Cir. 2001). It is further

**ORDERED** that plaintiff's Motion for Leave to Amend the Complaint [Docket No. 70] is granted so as to allow plaintiff to add a claim for punitive damages as to defendant Stacey Jasper and otherwise denied. Plaintiff shall file an amended

complaint on or before **Wednesday, October 9, 2013**.

DATED October 4, 2013.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge